**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| VINCENT PINO,        ) | |
|       Plaintiff,        ) | |
|                       ) | **C.A. No. 05-44** |
|      v.        ) | |
|                       ) | **District Judge Conti** |
| EDMUND S. HAWLEY,        ) | **Magistrate Judge Baxter** |
|       Defendant.        ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.   RECOMMENDATION**

It is respectfully recommended that Defendant's motion for summary judgment [Document # 38] be granted.

**II.   REPORT**

On January 13, 2005, Plaintiff Vincent Pino filed this action pursuant to the Vocational Rehabilitation & Other Rehabilitation Services Act ("Rehabilitation Act"), 29 U.S.C. §§ 701, *et seq.*, against Defendant Edmund S. Hawley, Assistant Secretary of Homeland Security, Transportation Security Administration ("TSA"), alleging that the TSA discriminated against him based on an alleged disability. In particular, Plaintiff alleges that the TSA terminated his employment as a Supervisory Security Screener because of a medical condition - sleep apnea - that caused him to fall asleep while he was on duty operating an x-ray machine at the passenger screening checkpoint at the Pittsburgh International Airport. As relief for his claim, Plaintiff seeks declaratory relief, compensatory damages, back pay, and either front pay or reinstatement of his position, with all accrued benefits, wages and seniority. (Document # 17, Second Amended Complaint).

On August 14, 2006, Defendant filed a motion for summary judgment [Document # 38], arguing, *inter alia*, that Plaintiff's Rehabilitation Act claim is pre-empted by the Aviation

1

Transportation Security Act ("ATSA") and should be dismissed. Plaintiff has filed a brief in opposition to Defendant's motion [Document # 42], and Defendant has filed a reply brief [Document # 43]. This matter is now ripe for consideration.

### A.     Relevant Factual History

In or around July 2002, Plaintiff applied for a position with the TSA as a "Supervisor Screener" at the Pittsburgh International Airport. (Document # 37, Joint Statement of Material Facts, at ¶ 5; Document # 39, Defendant's Brief, Exhibit B). In conjunction with his employment application, Plaintiff completed a medical questionnaire on July 6, 2002, indicating that he was in "good health," and that he did not have frequent trouble sleeping, did not have periods of unconsciousness, and was not easily fatigued. (Document # 37, Joint Statement of Material Facts, at ¶¶ 6-7). Nonetheless, Plaintiff also indicated that he had been treated "off and on" for sleep apnea, but that he "no longer needed" a Continuous Positive Airway Pressure ("CPAP") device. (Id. at ¶ 8).

Two days later, on July 8, 2002, Plaintiff completed a second medical questionnaire, again indicating that he was in "good" health, and that he did not have frequent trouble sleeping, did not have periods of unconsciousness, and was not easily fatigued. (Id. at ¶¶ 9-11). Plaintiff also reiterated that he had been treated for sleep apnea, and that he was losing weight in an effort to help this condition. (Id. at ¶ 12).

TSA then asked Plaintiff to take a "physical performance test," which required him to perform short-term physical exercises that were strenuous and that placed Plaintiff at maximum or near maximum capacity. (Id. at ¶ 14). Plaintiff completed and passed this test. (Id. at ¶ 15).

On or around July 28, 2002, Plaintiff was hired as a Supervisory Security Screener, and was required to serve a one-year probationary period. (Id. at ¶¶ 16-17). During this probationary period, TSA retained the authority to terminate any employee who displayed deficient conduct. or performance. (Id. at ¶ 18). At all times relevant hereto, TSA personnel policies, which were written under the authority of the ATSA, required screeners to be mentally and physically fit for duty, and specifically required termination if a screener fell asleep on duty. (Id. at ¶ 21).

On June 15, 2003, a statement was prepared by Victoria Victorelli, a Security Screener at the Pittsburgh International Airport, indicating that Plaintiff fell asleep that day while operating the x-ray machine at the airport's passenger screening checkpoint. (Document # 39, Defendant's Brief, Exhibit G).  As a result, Plaintiff's employment was ultimately terminated by the TSA on or about August 6, 2003.

### B. The Standard of Review

Federal Rule of Civil Procedure 56(c)  provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."  Id.

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact.  See Fed.R.Civ.P. 56(c); Krouse v. American Sterilizer Co., 126 F.3d 494, 500 n.2 (3d Cir. 1997).  The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990).  Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'"  Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial.  Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S. 574 (1986);

3

Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will effect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

### C.     Discussion

Defendant argues that the ATSA pre-empts the Rehabilitation Act with regard to all of the TSA's employment decisions affecting security screeners employed pursuant to the ATSA. Plaintiff argues in response that (1) the TSA's hiring decisions are free from the constraints of the Rehabilitation Act, and (2) the ATSA does not pre-empt the Rehabilitation Act's proscriptions regarding the continued employment of "already employed individuals." (Document # 42 at p. 9). To resolve this conflict, this Court must examine the Congressional intent behind the Act, as well as the language of the Act itself.

#### 1.     Historical and Legislative Background of the ATSA

On September 11, 2001, nineteen men, now identified as foot soldiers of Osama Bin Laden's Al Qaeda network, hijacked four commercial airliners. Two of these airliners were

crashed into the twin towers of the World Trade Center in New York City, resulting in its collapse.  The third airplane was intentionally crashed into the Pentagon in Washington, D.C., while the fourth plane crashed in a rural area near Somerset, Pennsylvania, after several passengers overpowered the hijackers upon learning the fate of the other three planes.  Thousands of people perished in these attacks.

In response to these terrorist attacks, Congress enacted the ATSA, in order to *inter alia*, improve security at the nation's airports and to ensure the "safety and security of the civil air transport system." H.R. Rep. 107-296 at 53.[1]  The ATSA made airport security a direct federal responsibility, created the TSA, and mandated the Under Secretary of Transportation for

---

[1]

A law review article describes the historical context of the ATSA:

> In response to the clear and present danger of future terrorist attacks in the United States, (in addition to the measures immediately undertaken by the FAA), the Aviation and Transportation Security Act (ATSA) was signed into law on November 16, 2001.
>
> Congress passed the ATSA to bolster what many perceived as past security complacency. Prior to September 11, airlines and passengers were mostly concerned with on-time arrivals and departures. Airlines seldom searched checked baggage, and people passed with alarming frequency through security checkpoints with undetected weapons and false identification. Passengers boarded flights without paying much attention to the people sitting next to them. Most passengers tended to their own interests, tuning out those around them as well as safety instructions from flight attendants. Their concerns upon landing were only of waiting for luggage, ground transportation, and hotel reservations.
>
> After September 11, this complacency disappeared. For many months, armed military personnel roamed airports. Security guards, fellow passengers, and flight crews scrutinized everyone. In one instance, a pilot removed an Arab-American man from a  plane for allegedly suspicious conduct; the man happened to be a plain-clothes Secret Service agent.
>
> The ATSA responds to this change in atmosphere and broadly expands the government's control over, and active role in, aviation security. The Act establishes hands-on, full-time federal control over aviation security through the creation of the Transportation Security Administration. Under the Act, the President appoints an Undersecretary responsible for an administrative agency overseeing security in all modes of transportation, including air travel.
>
> A principal edict of the ATSA is the implementation of day-to-day screening operations of passenger air transportation and the hiring and training of a national force of security personnel, as well as the development of hiring and training standards for that force.

Kent C. Krause, Putting the Transportation Security Administration in Historical Context, 68 J. Air L. & Comm. 233, 243-44, Spring 2003.

Security ("Under Secretary") to assume complete responsibility for federal security screening operations at the nation's commercial airports.[2] Under the ATSA, security screeners became employees of the U.S. government, as opposed to employees of private contractors under contract to individual airlines.

Prior to the September 11, 2001 terrorist attacks, civil aviation security functions were the responsibility of the Federal Aviation Administration (FAA) and the individual aircraft carriers. By creating the new TSA, Congress intended to completely change the way in which airport screening and security were conducted.

The ATSA does not include a statement of findings or purpose, but the House Conference Report contains the following statement:

> The Conferees recognize that the safety and security of the civil air transportation system is critical to the security of the United States and its national defense, and that a safe and secure United States civil air transportation system is essential to the basic freedom of America to move in intrastate, interstate and international transportation. The Conferees further note that the terrorist hijacking and crashes of passenger aircraft on September 11, 2001, which converted civil aircraft into guided bombs for strikes against the United States, *required a fundamental change in the way it approaches the task of ensuring the safety and security of the civil air transportation system.*
>
> *The Conferees expect that security functions at United States airports should become a Federal government responsibility*, and it is their belief that while the number of Federal air marshals is classified, their presence would have a deterrent effect on hijacking and would further bolster public confidence in the safety of air travel. The Conferees also noted that the effectiveness of existing security measures, including employee background checks and passenger pre-screening, is currently impaired because of the inaccessibility of, or the failure to share information among, data bases maintained by different Federal and international agencies for criminal behavior or pertinent intelligence information.
>
> *The Conferees developed this legislation to address the security of the nation's transportation system.*

H.R. Conf. Rep. 107-296 at 53-54 (italics added).[3]

---

[2] Although ATSA refers to the Under Secretary of Transportation for Security, the Under Secretary is now known by the title "Administrator of the Transportation Security Administration." 49 C.F.R. § 1500.3.

[3] Although not dispositive of Congressional intent, President George W. Bush described the ATSA during his signing of the legislation:

(continued...)

The ATSA, thus, required the TSA to develop standards for the hiring and training of airport security screening personnel according to legislative requirements, and mandated the TSA to hire, train and deploy a sufficient number of federal security screeners to conduct screening of all passengers and baggage at commercial airports. Pub.L. No. 107-71, Title I, §§ 101, 110, 115 Stat. At 597-598, 615-616, 49 U.S.C. § 114 and 49 U.S.C. § 44901 and Note.

### 2. Relevant Language of the Act

The ATSA gives the Under Secretary unfettered discretion with regard to the hiring, and terms and conditions of the employment of security screeners as follows:

> **Notwithstanding any other provision of law**, the Under Secretary of Transportation for Security may **employ, appoint, discipline, terminate and fix the compensation, terms, and conditions of employment** of Federal Service for such a number of individuals as the Under Secretary determines to be necessary to carry out the screening functions of the Under Secretary under section 44901 of Title 49, United States Code. The Under Secretary shall establish levels of compensation and other benefits for individuals so employed.

Pub.L.No. 107-71, Title I, § 111(d), 115 Stat. 620, 49 U.S.C. § 44935 Note (emphasis added).

In 2004, a federal district court in Texas was presented with the question of whether the ATSA pre-empted the Rehabilitation Act in the hiring context. Tucker v. Ridge, 2004 WL

---

[3](...continued)
Today, we take permanent and aggressive steps to improve the security of our airways. The events of September the 11th were a call to action. And the Congress has now responded.

\*   \*   \*

Now, we take the next important step. For the first time, airport security will become a direct federal responsibility. Overseen by a new Under Secretary of Transportation for Security. Additional funds will be provided for federal air marshals. And a new team of federal security managers, supervisors, law enforcement officers and screeners will ensure all passengers and carry-on bags are inspected thoroughly and effectively. The new security force will be well-trained, made up of U.S. citizens. **And if any of its members do not perform, the new Under Secretary will have full authority to discipline or remove them**.

Remarks by the President at Signing of Aviation Security Legislation, Ronald Reagan National Airport, at http://www.whitehouse.gov/news/releases/2001/11/20011119-2.html. (Emphasis added).

7

1401201, at * 4 (E.D. Tex. June 2, 2004). In concluding that the Rehabilitation Act was pre-empted, the court examined the wording of the ATSA and held:

> When used by Congress, the word 'notwithstanding' overrides any specified, contrary provisions of law. Shomberg v. United States, 348 U.S. 540, 547-48 (1955); Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993). When Congress states that a law will apply 'notwithstanding any provision of law,' the court must assume that Congress means what it says – namely, that the law applies even when it would violate otherwise applicable statutes.
>
> In reading the plain language of a statute, the cardinal principle of statutory construction is to save and not destroy. United States v. Menasche, 348 U.S. 528, 538-39 (1955); accord TRW, Inc. v. Andrews, 534 U.S. 19, 31 (2001). The duty of a court interpreting a statute is to give effect, if possible, to every clause and word of a statute. Id. For the court to allow Plaintiff to proceed with his Rehabilitation Act claim, the court would have to ignore the 'notwithstanding' clause of the ATSA. Because the court cannot ignore provisions of the ATSA, Tucker's claims fail as a matter of law.

Tucker at *4 (parallel citations omitted). Accord Castro v. Secretary of Homeland Security, No. 04-16682 (11th Cir. Dec. 22, 2006)(ATSA exempts TSA from certain requirements of the Rehabilitation Act with regard to employment of security screeners).

The Tucker court's interpretation of the "notwithstanding" clause of the ATSA is consistent with the Third Circuit's interpretation of the same clause in the context of a different statute. See New Jersey Air Nat. Guard v. Federal Labor Relations Authority, 677 F.2d 276, 283 (3d Cir. 1982). See also Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993) ("As we have noted previously in construing statutes, the use of such a "notwithstanding" clause clearly signals the drafter's intention that the provisions of the "notwithstanding" section override conflicting provisions of any other section."); Conyers v. Merit Systems Protection Board, 338 F.3d 1380, 1382 (C.A.Fed. 2004)("[w]e think that the 'notwithstanding any other provision of law' language renders inapplicable general federal statues that otherwise would apply to the Under Secretary's power to 'employ, appoint, discipline, terminate, and fix the compensation, terms, and conditions of employment of Federal service' for screener positions").

The only remaining question, therefore, is whether the ATSA's pre-emptive power extends beyond the hiring process. The plain language of the Act states that it does. Specifically, the above-quoted section of the ATSA states that the Under Secretary may "employ, appoint, **discipline, terminate and fix** the compensation, **terms, and conditions of**

**employment**" of those employed by the TSA to "carry out the screening functions of the Under Secretary under section 44901 of Title 49, United States Code." 49 U.S.C. § 44935 Note (emphasis added). Moreover, Section 44935(e)(2)(A) of the Act provides:

> **Notwithstanding any provision of law**, [qualification] standards shall require, at a minimum, an individual - -
>
> \*            \*            \*
> (v) to have the ability to demonstrate **daily** a fitness for duty without any impairment due to illegal drugs, **sleep deprivation**, medication, or alcohol.

49 U.S.C. § 44935(e)(2)(A)(v) (emphasis added).

The foregoing provisions evidence Congress's intent to give the TSA *carte blanche* with regard to all of its employment decisions regarding security screeners, including the termination of an existing employee who is deemed to be no longer qualified to perform his screening job due to his lack of daily fitness for duty. See Yeager v. Chertoff, No. 06-740 (W.D.Wash. Nov. 13, 2006)(holding that ATSA pre-empts the Rehabilitation Act, including cases involving employee terminations, and TSA does not have to provide accommodations to employees who are not capable of meeting the specific physical qualifications and employment standards mandated by ATSA and/or the Under Secretary). This language is in line with the purpose of the Act. A more restrictive construction of the Act would fail to give full effect to Congress's overriding national security concerns that precipitated ATSA's enactment.

Given the historical backdrop against which Congress enacted the ATSA in November of 2001, as well as the express language of the statute itself, this Court recommends a finding that the ATSA preempts Plaintiff's Rehabilitation Act claim. Accordingly, the Defendant's motion for summary judgment should be granted and this case should be dismissed.

### III.    CONCLUSION

For the foregoing reasons, this Court respectfully recommends that Defendant's motion for summary judgment [Document # 38] be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written

objections to this report. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of any appellate rights.

                                                /s/Susan Paradise Baxter
                                                SUSAN PARADISE BAXTER
                                                Chief United States Magistrate Judge

Dated: March 5, 2007

cc:       The Honorable Joy Flowers Conti
           United States District Judge